Filed 10/13/15  In re Anna S. CA1/5

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| **In re ANNA S., a Person Coming Under the Juvenile Court Law.** | |
| **MENDOCINO COUNTY DEPARTMENT OF SOCIAL SERVICES,** | A142760 |
| **Plaintiff and Respondent,** | **(Mendocino County Super. Ct. No. SCUKJVSQ141700701)** |
| v. | |
| **G.S.,** | |
| **Defendant and Appellant.** | |

_____/

L.S. (mother) and G.S. (father) appeal from the juvenile court's dispositional order placing their daughter, Anna S., in foster care pursuant to Welfare and Institutions Code section 361, subdivision (c).[1]  Mother contends the court erred by removing Anna from her care because she "made significant progress in her services and could provide a safe and loving home."  Father contends the Mendocino Department of Social Services (Department) and the court failed to comply with the Indian Child Welfare Act (25 U.S.C. § 1901 (ICWA)).

---

[1]    Unless noted, all further statutory references are to the Welfare and Institutions Code.  We limit our recitation of facts relating to father to those relevant to the issue he raises on appeal.

1

We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

*Detention, Jurisdiction, and Disposition*

Anna was born in May 2014. About a week later, the Department filed a section 300 petition. The operative petition alleged Anna came within section 300, subdivision (b) because: (1) mother and father (collectively, parents) had a "violent" relationship and were "unable to provide Anna with a home free from the negative effects of violence[;]" and (2) mother had "substance abuse issues" inhibiting her parenting and she and Anna tested positive for marijuana when Anna was born. Father was arrested at the hospital for "domestic violence."

According to the detention report, father "had beaten [mother] up twice while she was pregnant" with Anna — mother had two black eyes during her pregnancy and scars where father had bitten her. Mother drank alcohol and used marijuana while pregnant. At the May 2014 detention hearing, the court detained Anna and placed her in foster care. The Department's jurisdictional report recommended declaring Anna a dependent and chronicled parents' extensive domestic violence. Parents submitted to jurisdiction and the court declared Anna a dependent (§ 300, subd. (b)).

According to the Department's July 2014 dispositional report, mother "engaged quite quickly" in her case plan. She: (1) attended drug counseling, individual therapy, and a women's empowerment group; (2) worked part time; (3) tested negative for drugs; and (4) visited Anna regularly and the visits went "very well." The Department, however, recommended Anna remain in foster care and parents receive reunification services because they "had some mental health issues and domestic violence that [do] not allow them to work together productively. They have . . . not recognized [Anna's] need for peace of mind and safety to be of equal importance. Both parents have undefined mental health issues that keep them from being able to make definitive decisions about safely parenting their child. If they benefit from treatment and can get beyond these issues, they have the ability to be very good parents."

2

At the August 2014 dispositional hearing, the social worker testified mother had "done really well" on her case plan and had the ability to "be an amazing mother." Mother cooperated with the Department, engaged quickly in the majority of services offered to her, sought out a therapist on her own, started working, and tested negative for drugs. During visits, mother was "wonderful" with Anna. Mother's therapist recommended returning Anna to mother. A restraining order prohibited father from contacting mother.

The social worker opined, however, it was "too early" to return Anna to mother because "[t]here was significant domestic violence" between parents and they had not "had enough time to be able to resolve that and learn how to deal with those behaviors."[2] Their fighting caused mother to go into labor prematurely; the social worker feared Anna would "get injured" if parents fought again, presenting a substantial risk of harm to Anna. Mother needed "counseling around the domestic violence" because she apparently had communicated with father and "need[ed] a longer period" of making "better choices" to demonstrate she understood and accepted the pattern of domestic violence in her relationship with father and other men in her life. According to the social worker, Anna could be returned to mother in three months if mother stayed involved in her women's empowerment group and dealt with father appropriately.

Mother described her relationships involving domestic violence, including with father. Mother had previously denied being in an abusive relationship with father and "minimized" the domestic violence in that relationship, but now acknowledged it. Mother was learning how to avoid abusive relationships. She also described her living situation and support network. When questioned by the court, mother conceded lying to a police officer a few months before the dispositional hearing and to hitting herself. Mother had stopped hitting herself and was "working with ways to cope."

---

[2] The social worker was also concerned a necklace Anna wore was a choking hazard but the domestic violence was her "main" reason for opposing Anna's return to mother at the dispositional hearing.

The court ordered Anna placed in foster care, concluding by clear and convincing evidence there was a "substantial danger to Anna's physical health, safety, protection, or physical or emotional well-being" if she were returned home. The court also determined there were "no reasonable alternative means to protect Anna." The court commended mother on her progress, but explained "there's a lot of things that [mother] was saying three months ago that don't jive with what she's saying today. And she's a 29-year-old woman who lived a large part of her life saying and doing certain things. And for me to believe the complete turn around in ten weeks, I don't find it credible." The court noted mother was involved in relationships involving escalating domestic violence from age 17 to 29 and declined help even while pregnant with Anna. Additionally, the court expressed concern about mother's self-harming behavior. It concluded the risks to Anna were "too great to warrant a return home today."

*ICWA Notice*

At the May 2014 detention hearing, father claimed his father — Anna's grandfather — is Cherokee and his paternal grandmother — Anna's great-grandmother — is "100 percent" Cherokee. Father stated, however, that he is not an enrolled Cherokee tribe member. Shortly after the detention hearing, father's mother, Karen, told the Department the grandfather's first and last name (Bret H.), date of birth, and place of residence. Karen also told the Department the great-grandmother's name was "Sharon--" and she lived in New York. The Department sent ICWA notices shortly before the August 2014 disposition hearing. In August 2014, seven of the noticed tribes, including the Cherkoee tribes, responded that Anna was not an Indian child within the meaning of ICWA and was not eligible for membership (25 U.S.C. § 1903(4)). At an October 2014 hearing, the court determined ICWA did not apply.

*The Appeal and Subsequent Proceedings*

Mother and father appealed from the dispositional order. In late 2014, the Department returned Anna to mother under a family maintenance plan. In September 2015, the court dismissed the dependency and returned Anna to mother. We take judicial

4

notice of the December 5, 2014 order returning Anna to mother and the September 17, 2015 order terminating dependency jurisdiction and granting custody of Anna to mother.

DISCUSSION

I.

*Substantial Evidence Supports Anna's Removal from Mother*

Mother contends the court erred by removing Anna from her custody and placing her in foster care. Under section 361, subdivision (c), children "'shall not be removed from the home in which they are residing at the time of the petition unless there is clear and convincing evidence of a substantial danger to the child's physical health, safety, protection, or physical or emotional well-being and there are no "reasonable means" by which the child can be protected without removal.'" (*In re Henry V.* (2004) 119 Cal.App.4th 522, 528.) "'We review an order removing a child from parental custody for substantial evidence in a light most favorable to the juvenile court findings. [Citations.]'" (*In re A.R.* (2015) 235 Cal.App.4th 1102, 1116, quoting *In re Miguel C.* (2011) 198 Cal.App.4th 965, 969.)[3]

Substantial evidence supports the court's finding that Anna was at risk of harm if she remained in mother's custody. (§ 361, subd. (c)(1).) Mother was in a series of abusive relationships for over 10 years and until Anna was born. At the time of the dispositional hearing, mother had been engaged in 10 weeks of services, but had only recently acknowledged the pattern of domestic violence in her relationships. As the social worker testified, mother's issues with domestic violence were not fully resolved.

---

[3] We requested supplemental briefing on whether the appeal is moot. Having considered the parties' supplemental briefing, we decline to dismiss the appeal as moot. As a general rule, an order terminating juvenile court jurisdiction moots an appeal from a previous order in the dependency, but "dismissal for mootness in such circumstances is not automatic," and is decided on a "'case-by-case basis.'" (*In re C.C.* (2009) 172 Cal.App.4th 1481, 1488, quoting *In re Kristin B.* (1986) 187 Cal.App.3d 596, 605.) "[I]n an abundance of caution and because dismissal of the appeal operates as an affirmance of the underlying judgment or order [citations] we consider the merits of [the] appeal." (*In re C.C., supra,* at p. 1488.)

5

Mother also had a history of harming herself.  That mother made considerable and commendable progress in the 10 weeks from detention to disposition does not demonstrate insufficient evidence supports the court's removal order.  (*In re T.W.* (2013) 214 Cal.App.4th 1154, 1163; *In re Francisco D.* (2014) 230 Cal.App.4th 73, 83.)

Mother's reliance on *In re A.E.* (2014) 228 Cal.App.4th 820 (*A.E.*) does not alter our conclusion.  In that case, the appellate court reversed an order removing a minor from parental custody, concluding "an isolated incident" where the father hit the child with a belt was "unlikely to recur" and did not support removal because "[e]vidence of past abuse, standing alone, does not meet the clear and convincing standard of proof required to justify [ ] removal" from parental custody under section 361, subdivision (c).  (*A.E., supra,* at p. 826.)  This case is unlike *A.E.* because the domestic violence in mother's life was not an "isolated incident . . . unlikely to recur."  (*Ibid.*)  It was chronic and pervasive.

*In re Daisy H.* (2011) 192 Cal.App.4th 713 (*Daisy H.*) does not assist mother. *Daisy H.* held physical violence between parents supports the exercise of jurisdiction under section 300, subdivision (b) only where "there is evidence that the violence is ongoing or likely to continue and that it directly harmed the child physically or placed the child at risk of physical harm."  (*Daisy H., supra,* at p. 717.)  *Daisy H.* is inapposite. Here, parents submitted to jurisdiction, admitting the allegation they had a "violent" relationship and could not "provide Anna with a home free from the negative effects of violence."  We also reject mother's claim the court erred by concluding there were no reasonable means to prevent Anna's removal.  Mother's alternate view of the evidence does not establish a lack of substantial evidence supporting the court's conclusion.

II.

*Any ICWA Error is Harmless*

Father contends the Department violated ICWA by failing to provide adequate notice to the Cherokee tribes.  According to father, the Department was required to interview Anna's grandfather, Bret H., to obtain the last name and contact information for Anna's great-grandmother, Sharon, so she "could have been contacted" by the Department.  "ICWA allows an Indian tribe to intervene in dependency proceedings, to

'protect the best interests of Indian children and to promote the stability and security of Indian tribes and families. . . .' [Citation.] ICWA contains specific notice requirements that apply when the juvenile court knows or has reason to know that an Indian child is involved. [Citation.] The Indian tribe determines whether the child is an Indian child, and its determination is conclusive. [Citation.] The juvenile court '"needs only a suggestion of Indian ancestry to trigger the notice requirement."' [Citation.] Under ICWA, no foster care placement or termination of parental rights proceeding may be held until at least 10 days after the tribe receives notice. [Citations.]" (*In re J.M.* (2012) 206 Cal.App.4th 375, 380 (*J.M.*).) "The social worker in a child dependency case is statutorily required to interview the child's parents and extended family members to gather the information required for the ICWA notice." (*In re I.B.* (2015) 239 Cal.App.4th 367, 376, citing § 224.3, subd. (c); *In re C.Y.* (2012) 208 Cal.App.4th 34, 39; see also Cal. Rules of Court, rule 5.481(a)(4)(A).)

The Department proposed a stipulated reversal and remand for ICWA compliance. We declined to accept the proposed disposition. Even if we assume the Department erred by not interviewing Anna's grandfather, Bret H., to find out more information about Anna's great-grandmother, Sharon, father's claim fails because he cannot establish prejudice. (*J.M., supra,* 206 Cal.App.4th at p. 383.) *J.M.* is instructive. In that case, the mother claimed the ICWA notices were defective because they omitted information about the child's great-great-grandparents. (*Id.* at p. 381.) The *J.M.* court held any error in omitting the great-great-grandparents' names was harmless: "The notice *did* include the children's immediate lineal ancestors—mother, grandparents, and great-grandparents— descendents of the great-great-grandparents who were purported members of the Papago Tribe (the Tohono O'odham Nation) . . . [which] disclaimed the eligibility for membership of the children, their mother, their grandparents, and their great-grandparents, and mother offers no explanation why the Tohono O'odham Nation might have reached a different conclusion if it had known the names of the great-great-grandparents." (*Ibid.*) As the court explained, this "is not a case where there are gaps in

7

the family tree, frustrating the Papago Tribe's ability to meaningfully investigate the children's eligibility for membership[.]" (*Id.* at p. 383.)

Here as in *J.M.,* the ICWA notices included information about father, and Anna's paternal grandfather, Bret H., the descendant of the great-grandmother, Sharon, who was — according to father — "100 percent" Cherokee. Father does not argue Sharon would have provided additional information that should have been included on the ICWA notices, nor that the Cherokee tribes might have reached a different result had they known more information about Sharon. (*J.M., supra,* 206 Cal.App.4th at p. 382.) We conclude father's claim that the Department should have contacted Bret H. so Sharon "could be contacted" by the Department does not establish reversible error.

*In re Shane G.* (2008) 166 Cal.App.4th 1532 (*Shane G.*) supports our conclusion. There, the mother claimed the court erred by failing to ensure the social services agency sent ICWA notice to the Comanche tribe. (*Id.* at p. 1539.) The appellate court rejected this argument and explained the agency was not required to notice the Comanche tribe. According to the *Shane G.* court, the social worker interviewed the maternal grandmother, who indicated the child's "great-great-great-grandmother was a Comanche princess. However, no one in the family ever lived on a reservation, attended an Indian school, participated in Indian ceremonies or received services from an Indian health clinic. Most significantly, the evidence before the court showed the Comanche tribe requires a minimum blood quantum for membership that excludes Shane. Thus, notice to the Comanche tribe was not required." (*Ibid.*, fn. omitted.)

The *Shane G.* court also determined the agency "performed a reasonable ICWA inquiry and determined there was no reason to believe Shane was an Indian child. Where, as here, the record is devoid of any evidence a child is an Indian child, reversing the judgment terminating parental rights for the sole purpose of sending notice to the tribe would serve only to delay permanency for a child such as Shane rather than further the important goals of and ensure the procedural safeguards intended by ICWA." (*Shane G., supra,* 166 Cal.App.4th at p. 1539.) As in *Shane G.,* there is no evidence anyone "in the family ever lived on a reservation, attended an Indian school, participated in Indian

8

ceremonies or received services from an Indian health clinic." (*Ibid*.)  Reversing the dispositional order where Anna has been returned to mother's custody and where the dependency has been terminated for the sole purpose of interviewing Bret H. would destabilize Anna. We conclude the Agency's failure to interview Bret H. was harmless.[4]

DISPOSITION

The dispositional order is affirmed.

_____

Jones, P.J.

We concur:

_____

Simons, J.

_____

Bruiniers, J.

---

[4]    Father's contention that the Department failed to include information about Anna's paternal aunts on the ICWA notices fails for the same reason.